COOLEY LLP
MATTHEW D. BROWN (196972)
(brownmd@cooley.com)
JEFFREY M. GUTKIN (216083)
(jgutkin@cooley.com)
AARTI REDDY (274889)
(areddy@cooley.com)
MORGAN E. LEWIS (322205)
(melewis@cooley.com)
JULIA M. IRWIN (352861)
(jirwin@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

Attorneys for Defendant
LINKEDIN CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JACQUELINE JACKSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No. 5:24-cv-00812-PCP<br><br>**DEFENDANT LINKEDIN CORPORATION'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Hearing Date: October 24, 2024<br>Time: 10:00 a.m.<br>Dept: Courtroom 8, 4th Floor<br>Judge: P. Casey Pitts<br>Trial Date: TBD<br>Date Action Filed: February 9, 2024 |

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION. .......... 1

II. ARGUMENT. .......... 2

A. Plaintiff Fails to Allege that LinkedIn Received Any Personally Identifiable Information From a Motor Vehicle Record. .......... 2

1. Plaintiff Fails to Allege That LinkedIn Received Personal Information from Her MyDMV Account. .......... 2

2. Plaintiff Fails to Allege That LinkedIn Received Any Other Personal Information from a Motor Vehicle Record. .......... 6

3. Gershzon's Reasoning Was Flawed and Should Not Be Adopted. .......... 10

B. Plaintiff Fails to Allege That LinkedIn Knowingly Obtained Plaintiff's Personal Information. .......... 11

C. The Challenged Conduct Here Falls Within the "Permitted Purposes" Exceptions, Which Independently Precludes DPPA Liability. .......... 14

D. Without the DPPA Claim, the Court Should Decline to Exercise Supplemental Jurisdiction Over the CIPA Claim and Should Dismiss the Action .......... 15

E. LinkedIn Reasserts Its Prior Arguments as to Federal Rule of Civil Procedure 19 and Plaintiff's California Invasion of Privacy Act Claim. .......... 17

III. CONCLUSION. .......... 17

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Almgren v. Shultz*,
2016 WL 5815889 (N.D. Cal. Oct. 5, 2016) .... 16

*Almoian v. Plies*,
914 F.2d 261 (9th Cir. 1990) .... 16

*Andrews v. Sirius XM Radio Inc.*,
932 F.3d 1253 (9th Cir. 2019) .... 6, 7, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .... 14

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 343 (1988) .... 16

*Davis v. Meta Platforms, Inc.*,
2024 WL 3293644 (D. Nev. July 3, 2024) .... 4, 8, 10, 11

*Dole v. United Steelworkers of Am.*,
494 U.S. 26 (1990) .... 5

*Dye v. Meta Platforms, Inc.*,
2024 WL 2125602 (E.D.N.C. May 10, 2024) .... 4, 8, 10, 11

*In re GEICO Customer Data Breach Litig.*,
2023 WL 4778646 (E.D.N.Y. July 21, 2023) .... 12

*Gershzon v. Meta Platforms, Inc.*,
2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) .... 10, 11

*Gershzon v. Meta Platforms, Inc.*,
No. 23-cv-00083 (N.D. Cal. Jan. 6, 2023), ECF No. 1 .... 8, 10, 11

*Jackson v. LinkedIn Corp.*,
2024 WL 3823806 (N.D. Cal. Aug. 13, 2024) .... *passim*

*Keogh v. Meta Platforms, Inc.*,
680 F. Supp. 3d 601 (D.S.C. 2023) .... *passim*

*Knight v. Meta Platforms, Inc.*,
No. 23-13347 (D.N.J. July 29, 2024), ECF No. 19 .... 4, 8, 10, 11

## TABLE OF AUTHORITIES
(continued)

**Page**

*Lenk v. Monolithic Power Sys., Inc.*,
2017 WL 4586832 (N.D. Cal. June 1, 2017) .......... 16

*Rand v. Travelers Indem. Co.*,
637 F. Supp. 3d 55 (S.D.N.Y. 2022) .......... 12

*Senne v. Vill. of Palatine, Ill.*,
695 F.3d 597 (7th Cir. 2012) .......... 5, 12

*TMI Prods., Inc. v. Rosen Ent. Sys. L.P.*,
2014 WL 12601062 (C.D. Cal. May 9, 2014) .......... 16

*In re USAA Data Sec. Litig.*,
621 F. Supp. 3d 454 (S.D.N.Y. 2022) .......... 12

*Wren v. Sletten Constr. Co.*,
654 F.2d 529 (9th Cir. 1981) .......... 16

**Statutes**

18 U.S.C. Section 2721(b)(1) .......... 14

18 U.S.C. § 2724(a) .......... 12

18 U.S.C. § 2725(1) .......... 6

18 U.S.C. § 2725(3) .......... 3, 5

28 U.S.C. § 1331 .......... 15

28 U.S.C. § 1332(d)(2) .......... 15

28 U.S.C. §§ 1332(d)(4)(A)(i), (d)(4)(B) .......... 15

28 U.S.C. § 1367(c)(3) .......... 15

Cal. Veh. Code §§ 22511.5(b), 22511.55(a)(1)(C), 22511.56 .......... 8

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .......... 14

Federal Rule of Civil Procedure 19 .......... 17

Federal Rules of Civil Procedure 12(b)(6) .......... 1, 17

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE THAT,** on October 24, 2024 at 10:00 am in Courtroom 8 of the above-captioned Court, Defendant LinkedIn Corporation ("LinkedIn") will and hereby does move this Court, pursuant to Federal Rules of Civil Procedure 12(b)(6) for an order dismissing Plaintiff Jacqueline Jackson's First Amended Class Action Complaint with prejudice. The Motion is based upon the below Memorandum and Points and Authorities; all papers on file; and such further argument that the Court may consider.

## ISSUES TO BE DECIDED

Whether the Court should dismiss Plaintiff's Drivers' Privacy Protection Act ("DPPA") claim in the First Amended Complaint ("FAC") because she has failed to state a claim under Rule 12(b)(6). Whether the Court should dismiss the FAC because this Court lacks subject matter jurisdiction.

## I. INTRODUCTION.

This Court previously dismissed Plaintiff's DPPA claim because Plaintiff had failed to plausibly allege that LinkedIn received her disability information from a motor vehicle record. *Jackson v. LinkedIn Corp.*, 2024 WL 3823806, at *4 (N.D. Cal. Aug. 13, 2024) ("Jackson does not explain how such disability information embedded within URLs qualifies as a motor vehicle record"). In the FAC, Plaintiff attempts to cure this deficiency by adding allegations concerning her MyDMV account. *See* FAC ¶¶ 7-8, 43, 46-48, 51-52, 105. Yet she has again failed to plausibly allege that LinkedIn received her disability information from a motor vehicle record, because she does not—and cannot—allege that her MyDMV account contained ***any*** information revealing her disability status. Instead, her disability information was allegedly shared with LinkedIn solely because of her own actions on the DMV website and the DMV's URLs, which the Court already found did not come from a motor vehicle record.

Apparently recognizing that she could not get around the Court's first dismissal on this basis, Plaintiff now attempts to add allegations about other kinds of personal information allegedly stored within her MyDMV account. Despite these additions, Plaintiff ***at most*** now alleges: (1) that

LinkedIn received some purported personal information directly from Plaintiff via her interactions with her browser and (2) that there existed DMV records containing her personal information, but which have nothing to do with this case.

Plaintiff's attempt to cobble together a DPPA violation from the irrelevant facts she can allege is an exercise in misdirection. This Court should not be distracted from the reality that the FAC fails to allege the crucial connection needed to plead this claim. She can plead that LinkedIn received certain information and that the DMV had certain personal information about her, but she does not and cannot plead that LinkedIn received any disability or personal information ***from*** a motor vehicle record.

Because the ill-fitting puzzle pieces Plaintiff sets out do not complete the picture, her FAC once again fails to state a DPPA violation. The Court should dismiss that claim with prejudice and, because it will no longer have subject matter jurisdiction, dismiss the entire action.

## II. ARGUMENT.

### A. Plaintiff Fails to Allege that LinkedIn Received Any Personally Identifiable Information From a Motor Vehicle Record.

#### 1. Plaintiff Fails to Allege That LinkedIn Received Personal Information from Her MyDMV Account.

Plaintiff's newly-added allegations about her MyDMV account are a red herring that change nothing about the viability of her DPPA claim. As previously held, alleging a DPPA violation requires that LinkedIn 1) knowingly obtained Plaintiff's personal information, 2) from a "motor vehicle record," 3) for an impermissible purpose. *Jackson*, 2024 WL 3823806, at *4. While this entire action centers on LinkedIn's purported receipt of disability-related information, Plaintiff not only fails to allege that LinkedIn received her disability information from her MyDMV account, she fails to allege receipt of ***any personal information*** within the meaning of the DPPA ***from her MyDMV account***.

First, Plaintiff alleges that in creating a MyDMV account, she provided "personal information, including her first and last name, phone number, and email address," which was "saved to the DMV's database." FAC ¶ 7. She further alleges, incoherently, that "the Insight Tag was active within each user's MyDMV account." *Id.* ¶ 46. But tellingly, she fails to allege that the

Insight Tag transmitted ***any*** "personal information" from the DMV that had been "saved to the DMV's database" to LinkedIn. Nor could she.

Per Plaintiff's own allegations, the Insight Tag transmits only three kinds of information to LinkedIn—URL text, that a particular button was clicked, and browser cookies that allegedly match these transmissions with LinkedIn members. *Id.* ¶¶ 32-33, 50-66. Plaintiff's purported entry of her full name and phone number into her MyDMV account have nothing to do with this case, because ***nowhere*** does she allege that any of these pieces of information were sent to LinkedIn. She does not show URLs containing her phone number or full name (LinkedIn addresses her claims about her first name below), she does not claim such URLs exist, and she does not allege that buttons containing that information appear anywhere on the DMV site. In other words, allegations that Jackson provided the DMV with personal data—which is unremarkable—do nothing to show that LinkedIn ever ***received*** it.

Plaintiff attempts to obfuscate this fatal defect with artful pleading. For example, she vaguely alleges that "if a user were to change their address or phone number," "LinkedIn would learn that information[.]" *Id.* ¶ 48. While she apparently hoped to insinuate that LinkedIn learns individuals' addresses or phone numbers when they change them on the DMV website, the words "that information" in this sentence are misleading. Plaintiff actually means only that LinkedIn would learn that a change was made, not the content of that change.

Plaintiff alleges that when a user updates their phone number, LinkedIn receives the URL https://www.dmv.ca.gov/portal/update-your-phone-number and information "that the button 'Start' was clicked on that page," ***but not their actual phone number***. *Id.* ¶ 51. The Court will search the FAC in vain for any factual allegation showing that LinkedIn would learn a user's new address or phone number from their MyDMV data. Thus, when read closely, the FAC alleges only that LinkedIn learns that an individual has updated their phone number or address, which is, of course, not personal information within the meaning of the DPPA. 18 U.S.C. § 2725(3) ("'personal information' means information that ***identifies an individual***, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information") (emphasis added).

Plaintiff further alleges that during the update process, LinkedIn receives "unique identifiers for the user"—the "lms_ads" and "lms_analytics" cookies that can "identify LinkedIn Members off LinkedIn." *Id.* ¶¶ 32-33, 52. But browser cookie identifiers are precisely the type of information that court after court has held does ***not*** come from motor vehicle records, as DPPA liability requires, but from an individual via her interactions with her own browser. *See Davis v. Meta Platforms, Inc.*, 2024 WL 3293644, at *5 (D. Nev. July 3, 2024) ("Even if Davis had plausibly alleged that the Nevada DMV website is a motor vehicle record under the DPPA, he has not plausibly alleged that the c_user and fr cookies came from that website."); *Knight v. Meta Platforms, Inc.*, No. 23-13347 (D.N.J. July 29, 2024), ECF No. 19, at 4 ("[T]he information contained in the cookies—i.e., Plaintiff's Facebook ID—was not pulled 'from' the New Jersey MVC website."); *Dye v. Meta Platforms, Inc.*, 2024 WL 2125602, at *4 (E.D.N.C. May 10, 2024) ("[T]he information contained in the cookie comes, not from the myNCDMV website or any DMV database, but from the webpage visitor's browser[.]"); *Keogh v. Meta Platforms, Inc.*, 680 F. Supp. 3d 601, 611 (D.S.C. 2023) (same). The *Keogh* court, for example, rejected the plaintiff's argument that because "tracking computer 'cookies' [are] generated when Facebook members visit the SCDMV website," they implicate the DPPA, emphasizing that these identifiers "did not come 'from' a 'motor vehicle record'—regardless of how the 'cookies' which included the number were generated." *Keogh*, 680 F. Supp. 3d at 604, 612.

A close read of Plaintiff's Complaint reveals that the ***only*** piece of information she alleges plausibly came from her MyDMV account is her first name, FAC ¶ 48—a dubious injury, given that LinkedIn is a website on which individuals like Plaintiff voluntarily make public their "***first and last name***, place of work, contact information, and other personal details" in order to reach "the world's largest professional network on the internet." FAC ¶¶ 22, 35. And the notion that Plaintiff's privacy was violated because LinkedIn received a first name—by matching her button click with a LinkedIn profile already "generally contain[ing] . . . a first and last name," *id.* ¶ 35—is not only facially unconvincing, but entirely unsupported by DPPA case law or common sense.

But even putting these considerations about the data Plaintiff had already voluntarily provided to LinkedIn totally aside, Plaintiff's reliance on the alleged transmission of her first name

fails for an independent reason. A first name by itself does not "identify an individual" as required by the DPPA. 18 U.S.C. § 2725(3) ("'personal information' means information that identifies an individual[.]") While courts have suggested that a "full name"—disclosed along with an "address, driver's license number, date of birth, sex, height and weight"—may be "personal information" within the meaning of the DPPA, *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 600 (7th Cir. 2012), a first name alone (in this case the common name "Jacqueline") hardly identifies an individual.

The DPPA's full definition of "personal information" confirms LinkedIn's point: It encompasses only "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information[.]" 18 U.S.C. § 2725(3). "In expounding a statute," courts "are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law"—and "words grouped in a list should be given related meaning." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35-36 (1990) (citations omitted). Application of these canons of statutory interpretation to the DPPA's definition of "personal information" requires that "name" be read as full name, and not just first name. Indeed, reading "name" to mean first name would render "name" a glaring outlier within a list of otherwise sensitive information that can pinpoint a particular person or reveal very specific facts about them. Plaintiff cannot seriously contend that "Robert" and "Megan" are remotely equivalent pieces of personal information to a social security number, driver's license number, or address, particularly when a broader identifier like zip code is expressly excluded from the list. What's more, reading "name" in the DPPA to mean only first name would directly contradict the statutory text stating that this is a list of "information that identifies an individual." *Id.*

For all these reasons, Plaintiff's additions pertaining to her MyDMV account do not alter the outcome. Plaintiff has not alleged that any information LinkedIn allegedly receives comes from that source, with the arguable exception of the word "Jacqueline," which is not sufficient to constitute personal information under the DPPA. 18 U.S.C. § 2725(3).

### 2. Plaintiff Fails to Allege That LinkedIn Received Any Other Personal Information from a Motor Vehicle Record.

Given that Plaintiff does not allege that LinkedIn obtains any personal information from her MyDMV account, her other allegations that it received personal and disability information from her interactions with the DMV's website—merely repeated from her original Complaint—fail for the same reasons the Court detailed in its last order. *Jackson*, 2024 WL 3823806, at *4 ("Jackson fails to adequately plead a claim under the DPPA because she does not sufficiently allege that the information LinkedIn purportedly obtained and used was from a 'motor vehicle record.'"). The DPPA draws within the ambit of "motor vehicle record" only records that "pertain[] to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles," 18 U.S.C. § 2725(1), and only information "maintained by the DMV" *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1260 (9th Cir. 2019). By contrast, "where, as here, the initial source of personal information is a record in the possession of an individual, rather than a state DMV, then use or disclosure of that information does not violate the DPPA." *Id.* This Court has already determined that LinkedIn's alleged receipt of personal information directly from URLs of pages for DPP applications and renewals does not amount to obtaining that information from a "motor vehicle record" within the narrow meaning of the DPPA. *See Jackson*, 2024 WL 3823806, at *4.

It bears emphasizing that the Court's ruling remains correct even if the information LinkedIn receives from DMV URLs also happens to appear in the DMV's records. In the essential holding of *Andrews*, the Ninth Circuit ruled that it does not violate the DPPA for one to obtain from an independent source information that is ***also*** in a DMV-held motor vehicle record. In *Andrews*, the defendant had obtained information from a drivers' license. Obviously, the allegedly improperly obtained information on a driver's license (full name, home address, driver's license number) is ***all*** also in the DMV's records. But if one gets that same information from a driver's license in a person's wallet and not from the DMV's records, the DPPA is not implicated. *Andrews*, 932 F.3d at 1259 ("[A] driver's license in the possession of its owner is not a qualifying 'motor vehicle record' under the DPPA.")

Suppose Plaintiff called the DMV to ask about when she needed to renew her driver's license, the agency requested her date of birth to verify when her license had expired, and a person standing nearby overheard her reply. The fact that Plaintiff's date of birth was also independently stored in the DMV's records would be entirely irrelevant to the transmission of information to the nearby listener, since those records would in no sense be ***the source*** of the information he received. But this is precisely what the DPPA requires. Indeed, in *Garey v. James S. Farrin, P.C.*, the Fourth Circuit explicitly rejected a contrary interpretation of the DPPA, writing:

> This case might be different if Congress had said what the Plaintiffs assert Congress meant, i.e., that the DPPA protects personal information derived from a motor vehicle record, even if a defendant did not retrieve the information directly from such a record. ***But Congress did not enact such a law.*** In fact . . . Congress considered ***and rejected*** a version of the statute that would have done exactly what the Plaintiffs believe Congress meant to do.

35 F.4th 917, 926 (4th Cir. 2022) (first emphasis added) (analyzing legislative history) ; *see Andrews*, 932 F.3d at 1260 ("[W]here, as here, the initial source of personal information is a record in the possession of an individual, rather than a state DMV, then use or disclosure of that information does not violate the DPPA.").

Thus, the key question for this Court is whether Plaintiff alleges that LinkedIn received information ***from*** the records "maintained by" the DMV. It is clear that Plaintiff does not allege this.

**a. DPP Application and Renewal Process**

Plaintiff's repeated allegations regarding information entered into webforms on various DPP-related DMV webpages during the DPP application process remain insufficient. Plaintiff attempts to address her prior deficiencies by adding two vague paragraphs about the DPP renewal process, alleging that users must verify their renewal notice numbers or DPP numbers to renew online, and that LinkedIn "obtain[s] URL information." FAC ¶¶ 62-63. However, she ***nowhere*** alleges that the DMV configured its URLs to actually disclose these renewal notice numbers or DPP numbers—instead, she alleges that this URL information merely "show[ed] that the

application was completed and submitted to the DMV." FAC ¶ 63. Thus, in alleging only that LinkedIn receives URL information as a member navigates through the DMV's DPP-related webpages, FAC ¶¶ 57-61, rather than information from any record, Plaintiff merely repeats her already rejected allegations.

As every on-point decision after *Gershzon* has confirmed, DMV websites in general are not "records" at all. *See Davis*, 2024 WL 3293644, at *4 (Nevada DMV website not a record); *Dye*, 2024 WL 2125602, at *3 (North Carolina DMV website not a record); *Knight*, No. 23-13347, ECF No. 19, at 3 (New Jersey DMV website not a record); *Keogh*, 680 F. Supp. 3d at 609 (South Carolina DMV website not a record). These same decisions have also confirmed that DMV websites are not "motor vehicle" records because they contain "abundant information unrelated to 'driving,'" just as disability parking placards are unrelated to driving in this case. *Keogh*, 680 F. Supp. 3d at 610; *see also Dye*, 2024 WL 2125602, at *3; *Davis*, 2024 WL 3293644, at *4; *Knight*, No. 23-13347, ECF No. 19, at 3.

Nothing about the California DMV's website or the FAC renders this case law distinguishable. Indeed, in California, disability placards pertain solely to ***parking privileges***, not an operator's permit. The California Vehicle Code contains multiple references to the "parking privileges" disability placards confer but makes no connection between placards and operators' permits. *See, e.g.*, Cal. Veh. Code §§ 22511.5(b), 22511.55(a)(1)(C), 22511.56. The FAC confirms that disability placard information appears on the DMV website page titled "Disabled Person ***Parking*** Placards and Plates." FAC ¶ 57 (text and screenshot) (emphasis added). In the "Frequently Asked Questions" section of the webpage bearing that title, the DMV answers, "What are the privileges of a DP placard or DP License Plates?" with only a list of places a driver with a disability placard "may park" and a single reference to a service station privilege. ECF No. 22-3, Reddy Decl. Ex. D; ECF No. 21 at 2, 5-6. The page mentions no rights or privileges pertaining to a motor vehicle operator's permit. Additionally, the DMV publicly states that disability placards may be used when the recipient is only a passenger, further confirming that they do not pertain to an "operator's permit." *Id.* ("Placards . . . [are] a good option for a caregiver who transports a disabled person").

**b. DPP Status Checker.**

In the FAC, Plaintiff once again relies on allegations that DPP applicants can "enter the 'case number' and 'email address' associated with their application" in the DMV's status checker feature. FAC ¶ 64. She further alleges that, when applicants do so, LinkedIn receives a URL containing the associated case number and email address. FAC ¶¶ 62, 65. This allegation is unavailing for several reasons. First, Plaintiff never alleges that she personally used that "status checker" portion of the webpage and entered her information there, so her allegations about this feature have nothing to do with the viability of ***her*** claims Second, that information is expressly alleged to not come from anything stored in the MyDMV database or any other motor vehicle record, but rather from the URL the DMV's webpage causes to populate after submitting that status check. *Id.* ¶ 65. Additionally, the FAC makes clear that these pieces of data come from information Plaintiff herself entered into a webform so that the DMV could match what she entered with information already in its records to verify her identity. *Id.* ¶ 64 (second image). The fact that the DMV may also store Plaintiff's case number and email address in its records is of no moment, as such records are not ***the source*** of the information allegedly transmitted to LinkedIn. Instead, Plaintiff alleges that the source of the email address LinkedIn received was Plaintiff's interactions with her browser: her typing and submitting her information via a webform, and the DMV's repetition of that information in a URL.

Plaintiff further alleges that this information is intercepted ***in transit to*** the DMV, which is an allegation the Court deemed plausible in its prior CIPA holding. *See* FAC ¶ 113; *Jackson*, 2024 WL 3823806, at *6. It is self-evident that data cannot be both intercepted in transit between Plaintiff and the DMV and also data sent from the DMV's databases to LinkedIn.

Finally, Plaintiff's FAC adds no meaningful facts to her original allegations about the DPP renewal process. *Compare* FAC ¶¶ 62-66, *with* Complaint ¶¶ 54-57. Consistent with this Court's prior determination that these allegations are insufficient to state a DPPA violation, it should refuse to entertain those allegations as repeated in Plaintiff's FAC.

#### c. Plaintiff Fails to Allege that Any Information Entered Into a Search Bar is From a Motor Vehicle Record.

Plaintiff also repeats her allegation that "LinkedIn also learns the contents of all communications that MyDMV users send to the DMV through the search bar on the DMV website." FAC ¶ 52. Again, the reference to "MyDMV users" is a red herring, as the search bar-related allegations have nothing to do with MyDMV accounts. Indeed, Plaintiff makes no allegation suggesting the search bar inputs are ever recorded in a DMV record. Instead, Plaintiff has alleged only that LinkedIn received search bar inputs due to the construction of the DMV's URLs when the visitor types the search into the DMV website. Absent any allegations connecting search bar queries to a motor vehicle record, Plaintiff's argument runs into the brick wall of decisions holding that DMV websites are not motor vehicle records. *See Davis*, 2024 WL 3293644, at *5; *Knight*, No. 23-13347, ECF No. 19, at 4; *Dye*, 2024 WL 2125602 at *4; *Keogh*, 680 F. Supp 3d at 611; *see supra* Section III.A.1.a. Thus, Plaintiff also fails to allege any facts upon which this Court could conclude that information allegedly transmitted to LinkedIn via a search bar query comes from a motor vehicle record.

### 3. *Gershzon*'s Reasoning Was Flawed and Should Not Be Adopted.

Plaintiff will no doubt protest that allegations regarding a MyDMV account were sufficient in *Gershzon v. Meta*—indeed, some of them appear directly copied and pasted from the complaint in that case. *Compare, e.g.*, FAC ¶¶ 46, 51, *with* Complaint, *Gershzon v. Meta Platforms, Inc.*, No. 23-cv-00083 (N.D. Cal. Jan. 6, 2023), ECF No. 1 ("Gershzon Compl."), ¶¶ 33, 52.

The *Gershzon* Court's reasoning for refusing to decide the case at the pleadings stage on the facts alleged was unpersuasive and this Court should decline to follow it. LinkedIn respectfully submits that, in *Gershzon*, the Court incorrectly found that, with respect to the question of where the challenged information originated from, the plaintiff's complaint implicated "factual questions that are not amenable to resolution at the pleadings stage." *Gershzon v. Meta Platforms, Inc.*, 2023 WL 5420234, at *8 (N.D. Cal. Aug. 22, 2023). The facts LinkedIn's argument rests on here (that the alleged personal information comes from website URLs and things Plaintiff typed into webforms) are facts that Plaintiff herself ***alleged are true***—and "a court must accept as true all of

the allegations contained in a complaint[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* FAC ¶ 64 (second image) (depicting information input by an individual into a webform for DPP renewal ***by a DMV website visitor***); *Gershzon* Compl., ¶ 48 (same). *But see Gershzon*, 2023 WL 5420234, at *8 (finding the question whether "information Meta allegedly received . . . when plaintiff . . . checked [his DPP application's] status . . . was allegedly derived from plaintiff's *own online interactions* with the DMV website" a "factual question[] that [is] not amenable to resolution at the pleadings stage.").

Plaintiff will also argue that other decisions dismissing DPPA allegations premised on web pixel technology have distinguished *Gershzon* on the basis of its MyDMV-related allegations. But these cases uniformly disagree with the fundamental and indispensable premise of *Gershzon* that a DMV website is a Motor Vehicle Record. *See Davis*, 2024 WL 3293644, at *5; *Knight*, No. 23-13347, ECF No. 19, at 4; *Dye*, 2024 WL 2125602, at *4; *Keogh*, 680 F. Supp 3d at 611; *see supra* Section III.A.1.a.

*Gershzon's* entire rationale rests on a single line characterizing the plaintiff as having alleged "that Meta obtained his personal information from the DMV website and that the DMV maintained this information after Gershzon provided it to the DMV through his 'MyDMV' online account." *Gershzon*, 2023 WL 5420234, at *8. This portion of the order describes two separate events: Meta's obtaining information from the DMV website on the one hand, and Gershzon's provision of the information to the DMV, which it maintained, on the other hand. Blurring these lines, as the *Gershzon* ruling does, is clearly irreconcilable with the Ninth Circuit's binding decision in *Andrews*, which teaches that information obtained from a different source (there a driver's license) that is also, coincidentally in DMV records, does not implicate the DPPA. Indeed, the *Gershzon* Court's conclusion that the information entered into the web form was stored in the DMV's records "after" Meta obtained it actually should have defeated the DPPA claim, under the Ninth Circuit's decision in *Andrews.*

**B. Plaintiff Fails to Allege That LinkedIn Knowingly Obtained Plaintiff's Personal Information.**

Because this Court previously found that Plaintiff's Complaint failed to allege that LinkedIn

received her personal information from a motor vehicle record, it did not reach the question whether Plaintiff plausibly alleged another DPPA element: that LinkedIn "knowingly obtained" the challenged information. 18 U.S.C. § 2724(a) (establishing liability only for "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted[.]"). She does not.

Courts have consistently held that, to adequately plead a knowing DPPA violation, a plaintiff must allege that the defendant voluntarily took an action it was on notice would result in the obtainment, disclosure, or use of a plaintiff's personal information. For example, *Senne* held that a police officer placing a parking ticket displaying the plaintiff's personal information on his car dashboard took "[v]oluntary action . . . sufficient to satisfy the mens rea element of the DPPA." 695 F.3d at 603. Similarly, an insurance company designing its publicly-accessible online quote tool to auto-populate driver's license numbers for anyone entering "a bare minimum of publicly available information about [an] individual" knowingly disclosed personal information. *In re GEICO Customer Data Breach Litig.*, 2023 WL 4778646, at *1 (E.D.N.Y. July 21, 2023). A knowing violation can also occur where security alerts from a government agency provide notice of the potential disclosure. *See In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 468 (S.D.N.Y. 2022) (State Department of Financial Services warned that insurance quote portals created a cybersecurity risk); *Rand v. Travelers Indem. Co.*, 637 F. Supp. 3d 55, 68 (S.D.N.Y. 2022) (same).

While it is not necessary that the defendant have notice its actions are illegal, the DPPA does require ***knowing*** obtainment, disclosure, or use of the alleged personal information. 18 U.S.C. Section 2724(a). Accordingly, mere passive failure to prevent a third party (like the DMV) from allegedly causing LinkedIn to receive this alleged personal information is insufficient to meet the statute's knowledge requirement. In *Enslin v. Coca-Cola Co.*, the defendant's failure to secure laptops that contained personal information from employees' motor vehicle records was insufficient to trigger DPPA liability. 136 F. Supp. 3d 654, 669-72 (E.D. Pa. 2015). As the court explained, "[a] 'knowing disclosure' of [personal information] requires the defendant to take some 'voluntary action' to disclose the information." *Id.* at 670. Likewise, the court in *Allen v. Vertafore, Inc.* held that the defendant's storage of personal information on "unsecured external servers," that

permitted third parties to gain unauthorized access, was not knowing disclosure. 28 F.4th 613, 617 (5th Cir. 2022). Thus, a defendant must take a voluntary action that it is on notice ***would*** violate the first DPPA prong.

Plaintiff's Complaint cannot clear this bar and does not plausibly allege that LinkedIn "knowingly" obtained her information. She alleges only that LinkedIn engages in the anodyne and commonplace practice of offering advertising tag technology and propounds only conclusory allegations that LinkedIn "knows that the Insight Tag is operating on the DMV website and knows all the information and communications exchanged between users and the DMV." FAC ¶ 45; *see also id.* ¶ 67. Plaintiff does not allege or even suggest that LinkedIn had knowledge that it would allegedly receive the challenged information. Moreover, Plaintiff cannot rebut that the only voluntary action LinkedIn took with respect to Plaintiff's alleged personal information was to contractually prohibit the DMV from sending it. ECF No. 20-2, Castano Decl. Ex. B at §§ 5, 7; ECF No. 21 at 2, 6. LinkedIn's only knowing action was designed to ***prevent*** disclosure, not cause it.

The Complaint makes clear both that the DMV chose whether and where to install the Insight Tag (*see id.* ¶¶ 29-30) and that it is ***the DMV's chosen URLs and button text*** that contain the allegedly personal information. This is not enough to hold LinkedIn liable for third-party conduct. It is self-evident that ***the DMV*** set up its own webpages and chose how to configure its URLs. The Complaint does not and cannot allege that ***LinkedIn*** controlled the allegedly privacy-violating URLs the DMV chose to use on its webpage. Accordingly, LinkedIn took no voluntary action with knowledge that it would receive this allegedly impermissible information.

The Complaint also contains ***no factual allegations*** supporting the claim that LinkedIn was aware that the DMV was transmitting this allegedly personal information. Plaintiff never alleges, for example, that she received any form of targeted advertising related to her disability status, much less advertising that she has a basis to connect to LinkedIn or her visits to the DMV's website. *See Keogh*, 680 F. Supp. 3d at 606 (expressing skepticism where the plaintiff did not "describe or even allege that he received any advertising from Meta concerning his DMV visit"). Instead, Plaintiff falls back on generalities—*e.g.*, that the Insight Tag can transmit information that is generally used

for advertising services. *E.g.*, FAC ¶¶ 29, 72. With no specific facts pled, Plaintiff's conclusory claims that LinkedIn knowingly obtained and used her information from the DMV website fall well short of the pleading standard. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Finally, Plaintiff's position that LinkedIn's mere alleged receipt of information constitutes a DPPA violation would not only run afoul of authorities on the knowledge requirement, but would read the word "obtain" out of the statute. Unlike receipt, "obtainment" requires an affirmative act to bring about receipt. Black's Law Dictionary (11th ed. 2019) (defining "obtain" as "[t]o bring into one's own possession; to procure, esp. through effort"). Again, LinkedIn's only relevant affirmative acts were intended to contractually ***prevent*** LinkedIn's receipt of personal information.

### C. The Challenged Conduct Here Falls Within the "Permitted Purposes" Exceptions, Which Independently Precludes DPPA Liability.

Having found Plaintiff's Complaint deficient on other grounds, this Court also has not yet considered whether the challenged activity was conducted for a permitted purpose. Title 18 U.S.C. Section 2721(b)(1) permits obtaining personal information from a motor vehicle record where such conduct assists "any government agency . . . in carrying out its functions[.]" Despite Plaintiff's careful wordsmithing, the FAC concedes that the DMV installed the Insight Tag on webpages it chose. *See* FAC ¶¶ 29-30. As a government agency organized to serve a public function, common sense dictates that the DMV installed the Insight Tag for a legitimate government purpose, such as helping it to better understand the visitors to its website and improving the advertising of its services. *Id.* ¶ 23. Plaintiff alleges no contrary motivation.

The Complaint includes generic allegations that data transmitted through the Insight Tag are used to enhance ad targeting, but such handwaving is irrelevant. If the use of personal information is authorized to assist a government agency, the fact that such use may also serve a separate business purpose does not create liability. The First Circuit's finding in *Downing v. Globe Direct LLC* is highly instructive on this point. 682 F.3d 18, 25 (1st Cir. 2012). There, the defendant, a contractor for the Massachusetts Registry of Motor Vehicles' registration renewal program, inserted RMV ***advertisements*** in mailings containing registration renewals. *Downing*, 682 F.3d at 19-20. The First Circuit held that the inclusion of advertisements did not trigger DPPA liability,

because the mailings had the permissible purpose of assisting the agency in carrying out its functions. *Id.* at 23-24. Here too, the permissible purpose of helping the DMV market its services would preclude liability, despite Plaintiff's other non-specific allegations of marketing use.

### D. Without the DPPA Claim, the Court Should Decline to Exercise Supplemental Jurisdiction Over the CIPA Claim and Should Dismiss the Action

If the Court dismisses Plaintiff's DPPA claim, no basis for subject matter jurisdiction will remain and the Court should decline to exercise supplemental jurisdiction so that a California state court may decide the California state law issues between these California litigants.

Without the DPPA claim, the Court lacks subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and Plaintiff failed to properly allege the minimal diversity required for subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). *See* FAC ¶ 12. Instead, the Complaint merely asserts that this "is a class action" where "at least one Class Member is a citizen of a state of which LinkedIn is not a citizen." *Id.* However, Plaintiff and LinkedIn are both alleged to be California citizens, and nowhere does the Complaint allege any plausible facts that members of the CIPA class are not overwhelmingly California citizens. *See* FAC ¶¶ 6, 10. Indeed, such an allegation would strain credulity as the class definition is limited to LinkedIn members who visited the California DMV website to apply for, renew, or check the status of their California disability parking placard or, at a minimum, went to that site to access their own data in a California MyDMV account. *Id.* ¶ 90. Given the definition of Plaintiff's class, it is self-evident that at least two thirds of the CIPA class are California citizens and therefore the exception to subject matter jurisdiction applies. *See* 28 U.S.C. §§ 1332(d)(4)(A)(i), (d)(4)(B) (courts "***shall*** decline to exercise jurisdiction" over a class action in which "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed" (emphasis added)).

Not only does the Court lack subject matter jurisdiction, but it also lacks a basis to exercise supplemental jurisdiction. A court has discretion to decline to exercise its supplemental jurisdiction over state law claims when the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to exercise supplemental jurisdiction,

the court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Lenk v. Monolithic Power Sys., Inc.*, 2017 WL 4586832, at *2 (N.D. Cal. June 1, 2017) (citation omitted). In the "usual case in which all federal-law claims are eliminated before trial," these factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Almoian v. Plies*, 914 F.2d 261, at *1 (9th Cir. 1990) ("[W]hen the federal claims have dropped from the suit the balance of these values usually will point toward declining to exercise jurisdiction over the remaining state-law claims"); *Wren v. Sletten Constr. Co.*, 654 F.2d 529, 536 (9th Cir. 1981) ("When the state issues apparently predominate and all federal claims are dismissed before trial, the proper exercise of discretion requires dismissal of the state claim.").

If the DPPA claim is dismissed, the Court will face the "usual case in which all federal-law claims are eliminated before trial," and the balance of economy, convenience, fairness, and comity weigh against exercising supplemental jurisdiction over the CIPA claim. *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7. This dispute is in its early stages and has not proceeded past the pleadings; courts routinely decline to exercise supplemental jurisdiction over state law claims under these circumstances, in the interests of judicial economy. *See, e.g., Lenk*, 2017 WL 4586832, at *2 (declining supplemental jurisdiction where parties had only filed their initial pleadings and briefed a motion to dismiss); *TMI Prods., Inc. v. Rosen Ent. Sys. L.P.*, 2014 WL 12601062, at *4-5 (C.D. Cal. May 9, 2014) (declining supplemental jurisdiction even after the court had "developed familiarity with the facts of [the] dispute" because the simplicity of the state law claim "would not require extensive duplication" of the district court's efforts). Litigating the CIPA claim in California state court will not be inconvenient or unfair to Plaintiff or LinkedIn because they are both California residents, and dismissal will "promote[] comity by allowing the California courts to interpret state law concerning the state law claims in the first instance." *Lepe ex rel. E.G. v. Maldonado*, 2014 WL 5472654, at *11 (N.D. Cal. Oct. 28, 2014) (declining to exercise supplemental jurisdiction over state law claims after dismissing federal claim); *Almgren v. Shultz*, 2016 WL 5815889, at *2 (N.D. Cal. Oct. 5, 2016) (collecting cases where "the Ninth Circuit has repeatedly upheld district courts' exercise of discretion to decline supplemental jurisdiction over

remaining state claims after federal claims had been dismissed"). Given these circumstances, the Court should decline supplemental jurisdiction over the CIPA claim if it dismisses the DPPA claim under Rule 12(b)(6).

**E. LinkedIn Reasserts Its Prior Arguments as to Federal Rule of Civil Procedure 19 and Plaintiff's California Invasion of Privacy Act Claim.**

LinkedIn respectfully reasserts the arguments made in its prior motion to dismiss (ECF No. 19) that: 1) the Court should dismiss the action for failure to join a required party under Federal Rule of Civil Procedure 19 and 2) Plaintiff has failed to state a claim under the California Invasion of Privacy Act as a matter of law under Rule 12(b)(6). ECF No. 19 at pp. 5-12, 20-25. LinkedIn reasserts its arguments here solely to preserve them for appellate purposes and is not requesting that the Court reconsider its prior denial of these bases for dismissal.

## III. CONCLUSION.

For all these reasons, Plaintiff has not remedied the deficiencies in her DPPA claim. It is now clear that she cannot do so and the Court should dismiss this claim with prejudice and then decline to exercise supplemental jurisdiction and dismiss this action.

Dated: September 17, 2024

COOLEY LLP

By: *s/ Jeffrey M. Gutkin*
Jeffrey M. Gutkin

Attorney for Defendant
LINKEDIN CORPORATION